## JOSHUA ENGLISH vs. THOMAS H. LANE.

*An Appeal from a decree of the Mobile Circuit Court—*Before the Hon. P. T. HARRIS.

Notwithstanding the general rule, that a written contract cannot be contradicted, varied, or explained by parol ; yet a deed, absolute on its face, may be shown by parol proof, to have been intended to operate as a mortgage, especially in cases of fraud ; provided the parol proof be strong and satisfactory.

In cases of trust, fraud, accident, or mistake, chancery is competent to afford relief ; and where there has been a breach of trust, or a fraud committed, by setting out a conveyance as an adsolute sale, in violation of a parol agreement, between the parties, expressed and understood at the same time, that it should operate only as a mortgage, it will be sustained as a mortgage, notwithstanding the answer positively deny the parol agreement, if it be sufficiently proved, and the mortgagor or vendor has not participated in the fraudulent intent.

Gross inadequacy of price may imply fraud ; and is a circumstance, proper to be taken into consideration with other facts, to determine the intention of the parties, and the true character and object of a contract.

English brought a bill in chancery against Lane, in October 1830, alleging that in the spring of 1826, he (English,) was taken with a *ca. sa.* and put in jail for certain debts which he owed ; that these debts amounted to about $2300 or $2400 ; that he applied to Lane, who was an old acquaintance for advice, suggesting that he would be compelled to sell some of his negroes to obtain relief ; that Lane advised him not to sell ; but if possible to obtain a loan of money upon the hire of the negroes. The bill charges that ultimately Lane took the negroes himself, there being twenty eight in number, advanced him about three thousand dollars,

on an agreement that he was to keep the negroes until he should be remunerated by their services for the money so advanced; and that for Lane's greater security, the bill of sale was made absolute. The hire of the slaves is charged to be worth about $1500 per annum. English claims a restoration of the slaves, on the ground that the money advanced had been amply repaid by the services of the slaves.

The answer denies that there was any conditional agreement or mortgage, and insists that there was an absolute sale. It admits that the respondent, Lane, advised English not to sell his slaves, and states that he, Lane, endeavored to obtain money for English by hiring them; but having failed in these attempts, it is alleged, he made a purchase of them. Lane, in his answer, states that he advanced three thousand dollars for said slaves, and agreed to pay off English's debts, which he afterwards did, to the amount of about two thousand five hundred dollars more. He denies that it was a profitable transaction to himself; and says that at any time before the filing of the bill, he would have been willing to have returned the negroes, upon the payment to him of the money which he had advanced, with interest. There were a number of depositions taken; but a statement of their contents is not deemed necessary as an introduction to the argument. A very ample statement of the case is given in the opinion of the court.

PORTER, for complainant in error.

Although the bill of sale in this case was absolute on its face, we are not thereby precluded from proving from testimony, and from the circumstances of the case, that the transaction was in fact a mortgage. Parol testimony is inadmissible for that purpose—2 *Haywood*, 26.

In the case now before the court, the bill of sale is absolute; yet the negroes were put in possession of Lane, upon an understanding that when he should be compensated by

42

*English vs. Lane.*

English
vs.
Lane.

their labor for the money he had advanced, they were to be returned. Such a contract is regarded by courts of chancery as a mortgage.—1 *Day*, 139—1 *Washington*, 14, 125, *marginal page*; 2 *Cowen*, 324. By these authorities, the principle is laid down, that what is once a mortgage is always a mortgage.

An unequal contract made with a party in necessitous circumstances, will not be sustained by a court of equity.—2 *Dess.* 333. In the case cited, the inequality amounted to a loss of 30 per cent. In the case before the court, the loss, construing the sale as absolute, would be more than fifty per cent. The doctrine of the oppressed party being *particeps criminis*, as to the illegal contract, does not hold ; for he is presumed to act in some measure by necessity. A court of chancery will set aside a sale made under necessitous circumstances, for inadequacy of price.—For these principles, see 2 *Dess.* 571—1 *Brown's Ch. R.* 149—2 *ib.* 150, 167—1 *Peer Williams*, 310—*Doug. R.* 708—4 *Dess.* 697. I ask the court, whether to take the bill, answer, and proof, a case is not here presented, in which a court of chancery ought to grant relief. The necessitous circumstances mentioned in the books are not equal to this case. Here the party was confined in jail, while Lane was professing great friendship for him, and yet attempting to drive him to desperation by representations of the extraordinary scarcity of money. Even an action of assumpsit will lie for money obtained by oppression and extortion.—2 *Bur. R.* 101—5 *Littell's R.* 84—*Newland on Contracts*, 365.

Lane alleges that he paid $2500 above the $3000 paid on receiving the bill of sale. Does he produce receipts or other evidence ? This subsequent payment ought to be proved.

If the contract has been an unprofitable one, as Lane alleges in his answer, why should he be unwilling to have the contract rescinded, and an account ordered between the parties. The bill of sale itself states the consideration to be $3000. The number of negroes was twenty eight. Now when it is considered that the inequality of price was well

calculated to throw suspicion on the transaction as an abso- lute sale, is it to be believed that the vendee would have a less sum put in the bill of sale than the true consideration?

GOLDTHWAITE, *contra.*

A party cannot make out a case by evidence distinct from the one stated in the bill, and recover on the case so made out. The bill here goes upon the ground that the transaction was a mortgage ; and not on the ground of a fraudulent or oppressive sale, made for an inadequate price under hard and necessitous circumstances.

But consider it for a moment on this new ground. Was the necessity or the pressure of circumstances occasioned by Lane? Did he put English in jail? Did he bring his creditors upon him? No. On the contrary we find him active in his behalf, trying to get money for him, for the hire of his negroes. He did all that could be expected of a friend in that respect ; and finally, when he could not succeed, he gave him a better bargain for his slaves than he could obtain from any one else. The embarrassments which were then spoken of as hanging over the title of those slaves, furnish a sufficient reason for their not bringing a high price.

The case set out in the bill is unreasonable in itself. No one would have paid out $3000 in cash, and taken the burden and management of these negroes under the expectation of their working out the amount, under an obligation then to return them. The story will not bear telling. No one should expect so much as this from his friend.

Much stress is laid by counsel on the alleged inadequacy of price. But no inadequacy of price has been shown. It is pretended that the money paid by Lane was only $3000 ; but such is not the true state of the case. The complainant asks if $3000 was not paid on the execution of the contract ; and he asks him to say, if that was not the sum paid, what sum was paid. He asks Lane as to what executions he paid off ; what they amount to ; and how much more did he pay.—

These questions make all that is said in the answer, as to the amount paid, evidence in the cause· It is responsive to the bill. Now the answer says that $3( 00 were paid at the time of sale, and the bill of sale confirms the statement. The answer also states, that something like $2500 were afterwards paid in satisfaction of executions against English. This makes $5500. What then becomes ef the inadequacy of price, when we consider the embarrassment of old mortgages, with which it was said that the property was encumbered ?

The proof introduced by complainant, of the various negotiations previous to the contract, which was put in writing, are not admissible to explain the contract. When a contract is put in writing, all previous negotiations are merged in that contract—1 *Johns. Chan. Rep.* 273—2 *Kames,* 155— 8 *Wheaton,* 211. These cases fully establish the principle. But if these authorities were less conclusive; if it were necessary now to fix the rule upon principles of reason, the same rule ought to be established. What is the writing for but as the means of settling and determining what the contract is ? Take this rule away and we should be involved in difficulties that would render written contracts as uncertain as others, and more fatal instruments of fraud. Let in the parol proof of previous negotiations, and the conversation of the parties, in such contracts, and it will be found that the written instrument will scarcely weigh a feather in the scale, in determining what the contract is.

Here the whole contract, as set out in the bill, is denied in the answer. The only evidence that would seem to support the bill, goes merely to show that Lane, after having made the purchase, expressed a willingness to take the slaves back on the payment of what he had advanced : and this surely does not make out the case.

If proof of the antecedent negotiations could go to explain the written contract, this contract might be set aside for usury, if it had been alleged in the bill ; for Austill's testimo-

ny set out a usurious understanding. But the bill sets out no such transaction. According to English's showing, all was fair in the contract; but it was a fair mortgage—and not a sale.

It is contended that a bill of sale, absolute on its face, may be proved by parol, to have been in fact a mortgage. That cases may be found in which this doctrine is laid down may be admitted; but the principle to say the least, can only apply to cases where the proof is clear and free from question; which is not true of the case before the court. And no condition of the kind can be established unless it be made at the time of executing the deed; which was not the case here. Courts will not admit parol proof to convert an absolute bill of sale into a mortgage, without the strictest scrutiny.—1 *Johns. Ch. R.* 240—1 *Dess.* 340—1 *Murph.* 449.

Where a contract is reduced to writing, but one of the parties as to some agreement modifying it, relies on the word of the other, he must still rely on his word for his remedy; the courts will give no relief.—1 *H. Bl.* 659.

There seems to be no sufficient reason to take this case out of the general rule, that parol proof cannot be admitted to explain away or contradict a writing. All the evil to be apprehended by admitting such proof, and which the rule is intended to exclude, would be let in by admitting parol evidence to show that a bill of sale, absolute on its face, was in fact a mortgage or other sonditional agreement.

The cases relied on by the complainant's counsel, are cases in which the conditional character of the contract is not denied. The rule is admitted, that a bill of sale, absolute on its face, may be shown to have been in fact a mortgage' where such proof is not resisted by the denial of the other party. Here the conditional character of the sale is expressly denied by the answer : and I believe no case can be found where there was such denial, and the case solemnly adjudicated, that the crurt has admitted parol proof to contradict the writing as to the character of the sale. In support of these

*English*
*vs.*
*Lane.*

English
vs.
Lane.

views the court is referred to 13 *Mass. R.* 443—*Sugden on Vendors,* 118—6 *Johns. Ch. R.* 111—6 *Harris and Johnson,* 435.

Some reliance seemed to be placed by counsel, for relief, on the ground of English being a man liable to be imposed on : and it is said that contracts will be set aside when there was any weakness of mind, accompanied by great inadequacy of price. But it is only where such weakness amounts to a species of idiocy or lunacy that it will be regarded by the courts. Such person must at least be obviously of feeble mental powers : there must be a clear distinction between him and other men, whereby he is rendered less capable of contracting. Courts of equity will not undertake to distinguish between those shades of diversity of mental powers among men of common capacity. These courts have no standard whereby to measure men's intellect.

I maintain that according to all the books, parol proof can not be allowed, to show that a bill of sale, absolute on its face, was in fact a mortgage, except where it is admitted or not denied that such was the character of the transaction ; or, to say the least, except where the proof is such as to place the conditional character of the contract byond all question.

HOPKINS, on the same side.

The court can give no relief upon proofs not pertenant to the statements in the bill. The party can no more have relief upon proofs without allegations, than on allegations without proofs. If the party cannot make out his case according to his bill, he must fail.—*American Ch. Dig.* 396—3 *Littell,* 339—10 *Wheaton's Rep.* 189.

What then is the case here? As set forth in the bill, it has but one aspect ; relief being sought on the ground that the contract was in fact a mortgage, and that Lane will not comply with his agreement, but seeks to convert it into an absolute sale. The counsel, however, set up a new case. They treat it as a sale, and attempt to set it aside on the

ground of fraud. This new case need not be discussed : it is a departure from the complaint set forth in the bill. The cases cited are not applicable to the case presented by the bill. They are cases of fraud, of usury, and of gross inadequacy of price.

Cases may be found, I will admit, where courts of chancery have held that a deed, absolute on its face, may be proved by parol to be a mortgage, where the parol contract, constituting it a mortgage, was made at the same time of signing the instrument. But the cases are more numerous, and more deliberately adjudicated, where it is held that such proof cannot be admitted by the court, where the fact is contested by the other party. The rule insisted on here does not depend on the statute of frauds, but on the principle that parol proof cannot be admitted to explain or contradict a written instrument. The rule does not impair the principle, that a court of chancery may relieve against fraud or mistake, whether the contract be in writing or not ; for if it were alleged in the bill, and proved, that the deed was fraudulent or given by mistake, it might be set aside. There is no more reason why parol proof should be admitted to show that a deed absolute on its face, was in fact a mortgage, than to vary a written instrument in any other respect. Where the defendant admits that the deed was intended to operate as a mortgage, but wishes still to give it the force in law of an absolute deed, a court of chancery will treat it as a mortgage. All the cases cited by the complainant's counsel, are cases where the defendant admitted that the contract was a mortgage, except the case in 1 *Washington's Reports* ; and there it was established, and that by a written instrument, that the vendor remained in possession for two years after the contract; which remaining in possession was inconsistent with an absolute sale.

In this case, however, if proof of this kind were admissible, the fact is not proved. On the contrary, it is disproved by the answer of Lane. The defendant is not only a competent,

but a credible witness when made a witness by the complainant. An answer cannot be set aside except by two witnesses, or one witness and strong corroberating circumstances.— Here the denial of Lane is positive to all the material allegations in the bill; and there is no testimony in the case that can set it aside. The proof relates to previous negotiations, which are clearly inadmissible to explain or contradict a contract subsequently reduced to writing.

Nay, I contend that you may throw the answer out of the question altogether, and we have proof enough to establish this as an absolute sale. The bill of sale, itself, proves it.— This is equal to one witness making oath that he heard English acknowledge it to be an absolute sale : and there are two witnesses who swear that they understood it to be an absolute sale. Can a sale thus established be set aside by two witnesses, who prove nothing about the sale itself, but only antecedent negotiations and conversations ?

The story of the complainant is, in itself, incredible. He says the money advanced was $3000, and the slaves were to be returned when they had satisfied that sum. The services of the slaves are said to be worth $1500 or $2000 per annum ; yet English did not ask for their return till the end of four years. This shows that English considered the transaction a sale. This, at least, is a strong circumstance, not to invalidate, but to support the defendant's answer.

Being then an absolute sale, the price paid is immaterial ; for you cannot set aside this sale for gross inadequacy of price, upon a bill making no such charge, but setting forth that the contract was a mortgage, and claiming the right to redeem. But if the bill had claimed relief on the ground of gross inadequacy of price, the proof is not sufficient to show inadequacy. The answer of the defendant proves—for he is called upon to answer as to the amount of price—that the consideration was $5500. This statement is not contradicted, but supported by the proof ; for it is proved that Lane received from Ross about that time, a corresponding amount

of money. Now, one of the witnesses states that the slaves were not worth more than $7000; and he states that he would not have given that for them : the amount paid then, according to this evidence, was within $1500 of the value of the slaves : and that they did not bring more is accounted for by the fact, that there was some apprehension of the embarrassment of title on account of old mortgages.

STEWART, in reply.

The rule that parol proof is admissible to show that a deed absolute on its face was in fact a mortgage, is so well established, that it was not thought necessary on our part, to cite many authorities to that point. We could have cited fifty more. Indeed, Mr. GOLDTHWAITE sets out by admitting the rule ; yet most of his argument is against it. That this rule is subject to some restrictions, I grant; yet I cannot go the length of the opposing counsel, who contend that parol proof can only be admitted to show that the contract is a mortgage, when the defendant himself admits it to be so.— Why introduce proof then ? None would be necessary.

There must always be some sufficient cause for the variance between the actual and the written contract, (to let in the parol proof,) such as fraud, usury, accident or the like. Here the reason for the variance is apparent. English was in jail and in great perplexity. He was restless, and importunate to obtain his liberty. He wished to raise money upon any terms. Lane was willing to lend money, but he would not do so unless " he could be made perfectly secure." The transaction was in fact usurious ; and the sale was made absolute for the security of Lane. English is an honorable man: he is willing that Lane should be compensated beyond the principal and legal interest. The bill does not charge usury except incidentally. It has been contended that the bill is not well framed ; that we have not sought the proper remedy. We have selected the mildest remedy. If we show

43

that we are entitled to a greater remedy than we ask for, it does not injure our case. It is said that we do not charge fraud. This is not true : we charge all the facts of the case ; and the facts establish fraud. The word fraud is not necessary.

For inadequacy of price alone, I grant that it must be very gross, to be sufficient to set aside a contract ; but there are many cases where, with other circumstances, weakness of mind, necessitous situation, or the like, great inadequacy of price has been held sufficient to induce a court of chancery to set aside a contract. To effect this object might require a pretty strong case ; but it will not require so strong a case to enable the party to show the real character of the contract, that it was a mortgage, and to obtain leave to redeem.

It is unreasonable to suppose that there should have been a sale. Although English was in jail, it would have been a most improvident and unreasonable act, on his part, to have sold twenty eight slaves, when the hire of slaves was high, to relieve himself from debts to the amount of two thousand dollars, or a little over that sum. If a sale had been the object, four or five of them would have brought the money.

But much is said about the conclusive character of the evidence of the answer. It is said, that even if a man were known to be unworthy of credit, yet where he is made a witness by the opposite party, his answer is to be taken as true. This, as a general principle, is not denied ; but the principle must be guarded and qualified : taken in its unlimited sense, and without qualification or exception, it is not true. A complainant by calling on the defendant to answer, makes him a good witness ; but yet the answer may be compared with itself. This witness may be tried as another witness. If he say what is incredible, he cannot be believed. If the complainant say, the sun rises in the morning and sets at night, and the defendant deny it, is the latter to be believed? We may then compare the defendant's admissions with his denial. He knew that something would be proved about li-

berty to redeem : he therefore admits that he was willing at any time before the filing of the bill, to have given up the slaves, upon the payment of the money he had advanced, with the interest.  This statement throws suspicion on the denial ; and, taken in connection with the testimony, establishes a mortgage.  And the maxim of the law is, " once a mortgage always a mortgage."  This is a rule, indeed, which the law books say, does not admit of exceptions.

It is contended that the contract was unreasonable, as set out by the complainant, because the time of the return was not stipulated.  The true answer is, the remuneration was to be ample : it was in fact to be usurious ; and therefore it was not desirable to specify the time.  Lane said he must be safe : safe, it is presumed he meant, by the form of the contract. It may have been thought safer too, in view of obtaining an ample compensation without danger of incurring any forfeiture for usury, that the precise time for the return of the slaves should not be fixed.

But take the other side of the question: Is it not strange that Lane cannot tell for what price he made so large a purchase as this ?  He bought, he says, twenty eight negroes ; and he cannot tell how much he gave for them.  The bill of sale says three thousand dollars was the price : and it is not probable, as the price was inadequate at best, that less than the true price was put into the bill of sale.  Lane says he was to pay the debts of English.  That he might have agreed to pay these debts without knowing precisely the amount, considering the transaction as a mortgage, is not extraordinary ; fifty or one hundred dollars, more or less, would not have been important, as the whole was to be refunded with interest ; but sales of this kind are not made without fixing the amount at which they are made.

It cannot be accounted for, how, in a case of so much friendship on the part of Lane, there should have been inadequacy of price.  English, it seems, was very thankful for the kindness received.  Strange that he should be thankful

to a man for taking twenty eight slaves from him for the sum of three thousand dollars, that is, for little more than one third of what they were worth. There is too much friendship by half in this answer, when we consider it in connection with the established facts : such excess of friendship is sickening, and it throws a suspicion over the statements in the answer.

The defendant indeed claims to have paid five thousand five hundred dollars ; but, in this respect, the answer is not responsive to the bill. The defendant is inquired of, how much he paid upon the executions to relieve the complainant from jail, and from his embarrassments, at the time of the execution of the bill of sale. The complainant would not trust the defendant's conscience as to any payment made afterwards. But it is after-payments that the defendant speaks of in his answer, by which he swells the sum from three thousand dollars to five thousand five hundred dollars. The answer then, as to all above the three thousand dollars, not being responsive to the bill, is not proof. Besides, it is contradicted by the proof in the cause. The bill of sale contradicts it. It states the entire consideration of the contract to be three thousand dollars. The witnesses disprove it. The circumstances of the case disprove it. English, from all that appears from bill, answer, and depositions, does not appear to be seeking any thing but freedom from his pressing debts ; and they are proved to have been less than three thousand dollars.

It is contended that previous negotiations or conversations are not to be admitted to explain or contradict a written agreement. But this rule must be confined to cases where there is no fraud, trust, accident, or usury, or the like, to be inquired into by the court. Where any of these are to be exposed, previous conversations or negotiations become important, as circumstances, to show the true nature of the transaction.—5 *Randolph*, 211—1 *Starkie's Evidence*, 39.

The general rule, admitted as a general rule, applies more strongly in contracts for land, than in other contracts ; because there the statute of frauds also applies. But even in those cases, fraud will let in the proof. The opposing counsel says, that if the exceptions for which we contend were allowed, no title could be safe : they might all be taken away by perjury. The argument proves too much ; or rather it is obviously founded on an extravagant supposition, inconsistent with what is known of human nature. On the same principle, it may be said, that our lives may be taken away by perjury ; yet it is found to be wise to give credit to human testimony. The experience of ages has established that the admission of the exceptions we contend for, qualifying the general rule, is salutary, and less favorable to fraud and injustice, than the admission of the rule without exceptions.

It is remarkable that a fraudulent covered transaction can seldom be so consistent in all its parts, as to present at all times the appearance of honesty and truth. The truth itself will sometimes peep out through the artificial disguises.— Lane speaks of his embarrassments on account of this transaction : he says he fears he will, on that account be obliged to sell some of his " own negroes." His own ! These, then, were not his own. And why should he sell his negroes that he owned by a different title, rather than these, if he intended to make these his own ? He knew that, by the contract they were to be returned, and he did not know but this contract might sooner or later be brought to light, and enforced.

In transactions of this kind, where the object is the raising of money, if there be doubt, a court of equity will lean in favor of regarding the contract as a mortgage, because that construction is generally more favorable to the equity of the case. In this case, if the suit be decided against Lane, what has he lost ? Nothing. He will have been fully compensated

English
vs.
Lane.

for all that he did: but if it be decided against English, he will have lost his entire patrimony, and that for a mere trifle.

By Mr. Chief Justice SAFFOLD :

This was an appeal by English, from a decree of the Circuit Court of Mobile, dismissing his bill.

The bill was filed against Lane in October, 1830. The allegations, in substance, are—that English, the complainant, was owner of twenty eight negroes—that he was indebted by judgments to the amount of two thousand three hundred dollars or two thousand four hundred dollars, for which he was imprisoned on *ca. sa.*—that Lane was an old acquaintance, whom he considered his friend, and with whom he advised how he could best relieve himself, suggesting the necessity of selling some of his negroes to effect his release—that Lane dissuaded him from selling any, saying the object could be effected by the hire of them, so that he could save all—that he had known the same done by others in like condition, by the aid of friends, and from the long acquaintance and friendship he felt for him, he Lane, would undertake to arrange the matter accordingly—that it was agreed between them that Lane would take the negroes, and manage and use them as his own, pay off the executions, and pay five or six hundred dollars of other debts, and retain the negroes until their labor should repay him, and then return them to English—that when the contract came to be executed, Lane said it was necessary for his security he should have a bill of sale, absolute on its face ; but promised it should be surrendered when he was reimbursed ; and with this understanding, he, complainant, gave the bill of sale, confiding in Lane as his friend, and delivered him the negroes, twenty eight in number—that they were worth nine thousand dollars, would have sold for that sum in cash, and were worth two thousand dollars per year—that Lane had had them since that time, (March, 1826) their hire for the time being worth seven or eight thousand dollars—that Lane now contends that the sale

was absolute, and refuses to re-deliver the negroes unless re-paid the amount advanced. The complainant alleges, the conveyance was agreed and intended as a mortgage, and that the negroes had increased to the number of thirty one. The bill contains interrogatories to all the material facts charged, and among others, Was not the agreement as above stated, and if not, what was it? Did he, Lane, not pay off the executions, &c. and what did they amount to? How much money did he advance besides the executions? Did he not take receipts, and if so, where are they? The complainant prays that the negroes be restored, and that the bill of sale be surrendered and cancelled, and for such other and further relief as shall be just and equitable.

The answer of Lane admits, that being sent for by English, he visited him while in jail—that English wanted money to relieve himself from the imprisonment, to the amount of about two thousand five hundred dollars—that being his friend, he endeavored to make arrangements to raise the requisite sum of money out of the hire of the slaves, and took upon himself much trouble and pains endeavoring to effect an accommodation for English, but his efforts failed—that finally, to relieve his friend from jail, he agreed to purchase the negroes himself, and did purchase them all of English, without any condition whatever—that there was no trust, the sale being absolunte, and so understood between the parties, and that an absolute bill of sale was executed accordingly, a copy of which he exhibits, by which it appears English sold to him all said negroes for three thousand dollars, this being the consideration expressed in the bill of sale. The respondent avers, that the negroes are indefeasibly his, the complainant having no right to redeem—that he paid English the three thousand dollars, and has since paid for him the amount, he believes, of two thousand five hundred dollars more, making together five thousand five hundred dollars—that he was induced more by friendship for English, than by any motives of interest, to make the contract—that

to effect the accommodation, he was under the necessity of borrowing three thousand dollars on his own credit, and that he paid that sum to complainant as part consideration of the purchase of said negroes, and not as a loan to be paid by their hire, or to be secured by a pledge of them, which he avers did not enter into his contemplation, nor that of the complainant, as he verily believes, and that no word or promise passed between them, from which such an inference could be drawn. He further answers, that in addition to the consideration expressed in the bill of sale, he has since paid judgments against the said complainant, at his request, to the amount of two thousand five hundred dollars, or thereabouts, and which judgments he believes existed, with executions thereon, at the sime of the contract aforesaid—that he believes the sum he agreed to pay, and has paid for the negroes, is fully their value, or more, and that the contract has been an injury to him. On these allegations and denials, proof was taken.

James Conway, a witness on the part of the complainant, states that he was the sheriff who had the custody of English— that the executions amounted to from twenty three to twenty five hundred dollars—that Lane paid them, and said he was to pay all the debts of English—that he was a subscribing witness to the bill of sale—that no conversation passed between the parties at the time it was executed. This witness further deposes, in answer to questions by the counsel of Lane, that English said to him soon after the bill of sale was signed, that he was grateful to Lane for his kindness, and well satisfied with the arrangement made—that he preferred the arrangement with Lane, to that which had been proposed by one Mills, both of whom had proposed to take the property and relieve him from debt—that on his asking English in what manner the property was to be taken, he appeared unwilling to state the particulars of the contract, and remarked that Robert Singleton had set up a claim to his negroes,

which was unjust, but that his debts should be paid if it took the whole of his property.

Robert Singleton, also a witness on the part of the complainant, says he had particular knowlege of English's debts and negroes—that the cash value of the latter, at the time of the conveyance, was eight thousand five hundred to nine thousand dollars—that English had received the most of them as his patrimony, and they would then have sold for the price mentioned—that they would have hired for fifteen hundred dollars per year, at any time while Lane had them—that from an intimate acquaintance with English's debts, he does not think all he owed would have exceeded $3000—that twenty two to twenty five hundred dollars thereof were in executions in the hands of the sheriff: he also proved that Lane professed to be an old acquaintance and friend of English, and expressed a wish to relieve him, but said he must be made perfectly secure if he did so—that he, deponent, had a claim on the negroes, and that Lane was unwilling to advance money on them until this claim was relinquished; consequently deponent relinquished his claim in favor of Lane for the purpose of inducing him to advance money to relieve English—that deponent understood at the time of his relinquishment, that Lane was to advance money enough to pay English's debts, on the latter putting the negroes in the power of Lane; whether this was to be done by bill of sale or mortgage, witness knows not; Lane then remarked that it would take a long time for the negroes to work out the sum; but that English, or any of his friends might at any time redeem them by re-paying him the money; that this conversation was held in the jail, while English was confined therein; he was not present at the execution of the bill of sale, and knows not what arrangements were agreed on after he left the parties, which was anterior to the consummation of the contract.

Jeremiah Austill, a third witness examined for the complainant, states, that at the time of this contract, he and

44

Lane occupied different rooms in the same building in Mo·· bile, were conected in the business of weighing cotton, and very intimate—that Lane being sent for by English, to go to Blakely, went, and returned a day or two afterwards, then informed witness that the debts for which English was confined, amounted to about three thousand dollars—that English had proposed to him, if he would advance three thousand dollars, to relieve him from jail, he, English, would allow him two thousand dollars in addition to the three thousand, making five thousand dollars for the advance, and would give him a bill of sale for his negroes—that witness and Lane thought it a very good operation for Lane, and made some calculation, how long it would take for the hire of the negroes to discharge the five thousand dollars, if hired at Mobile Point, and concluded on two or three years—that after the contract and receipt of the negroes, by Lane, he made application to hire them at the Point, but failed ; afterwards, he put them to making brick at a different place, where they re-. mained twelve or eighteen months, when Lane said the business was unprofitable, and sent them on a farm. Deponent further states, that from his conversation with Lane after his first visit to Blakely, and while the negociation was pending, he understood, that, when from the hire of the negroes he should realise the sum of five thousand dollars, and the interest on the three thousand dollars, advanced by him, the negroes were to be returned to English, and the bill of sale given up ; also, that after the contract had been consummated, and before the negroes were sent to the farm, Lane said to him, he had become embarrassed in consequence of the advances to English, which he had not been able to realise from the negroes—that he either had made, or intended to make a proposition to English, that if the latter would pay him the amount he claimed, by a certain day, he would return him the negroes, and if he did not do so, he, Lane, would be under the necessity of selling some of *his own negroes*, and would never return to English the negroes

received of him—that upon the dissolution of the connection between deponent and Lane, some misunderstanding arose between them, since which, they had not been so intimate as before—that Lane had never, since the conversations mentioned, given him reason to believe, either by conversation or action, that the arrangement proposed by English had not been carried into effect—that Lane borrowed the three thousand dollars, and paid it as mentioned, not having it otherwise ; and deponent does not believe he made more than seven or eight hundred dollars a year by the negroes, but he has no positive knowledge on this point—that the negroes, when received by Lane, could have been hired at auction at from fourteen hundred to sixteen hundred dollars, but in that way they would have been more exposed to loss from hardships, than when under the charge of one interested in their welfare.

The record also contains letters written by Lane to English, during the imprisonment of the latter, evincing the strongest friendship, sympathy and anxiety for his release, and promising to do all in his power to raise money to effect the object, without a sale of the negroes, and in the manner most conducive to his interest.

William S. Littell was examined as a witness for the defendant. He says, he was about to take the negroes on hire, and advance three thousand dollars, which was supposed by English, Lane and himself, to be the amount necessary to relieve English—that he endeavored to raise the money, Lane persuading him to do so, and aiding him in the effort, but the arrangement failed. He was willing, had he succeeded, to have advanced the three thousand dollars, to be reimbursed by the hire of the negroes. He was to have given, on the proposition of Lane, ten dollars per month for the hire of the men, and eight dollars for the women ; these terms were less than the current prices, and so intended, in consequence of his paying so large a sum in advance. This witness afterwards saw English deliver the bill of sale to Lane.

J. Darington, a witness on the same side, deposes to matters of hearsay and inference mainly, which having been objected to at the time, and being now considered inadmissible, I omit to notice, except that he estimates the value of the negroes at only seven thousand dollars, saying there were twenty five or thirty in number.

J. A. Cooper, on the same side, deposes, that he was present when the bill of sale passed between the parties—heard much conversation between them previous to the contract, all importing a sale—that the bill of sale was delivered by English to Lane, at a coffee house in Blakely—that Lane paid the sheriff money, the amount unknown, and English was discharged. After the writings were passed, deponent has an indistinct recollection of hearing Lane say to English, that if he would pay him back the money in a certain time, (when, not recollected) he would restore the negroes ; and thinks Lane intimated his opinion, at the same time, that he had paid the value of the negroes, but of this, is not certain.

Jack F. Ross was also examined for defendant. His testimony, consisting mostly of the declarations of Lane, being objected to at the time, the following only is considered evidence—that in 1826, he paid Lane five thousand three hundred and seventy five dollars, on an order from S. Hunter ; also, that he, about the same time, purchased of Lane, a house and lot, at five or six hundred dollars, which he considered a low price.

The cause having been heard in the Circuit Court, on the bill, answer, exhibits, and proof, the chancellor decreed for the defendant, and dismissed the bill. This decree is now assigned as erroneous.

The questions involved have been fully discussed in the argument, various authorities cited, and the claims of each party alternately presented in the most imposing aspect.

The subject may be resolved into the following questions;

1. Is it competent for the complainant to show, *by parol*, that the contract was intended to operate as a mortgage ?

2. Is the evidence sufficient for this purpose ?

3. Are the allegations and prayer of the bill, appropriate to the remedy sought ?

English
vs.
Lane.

1. Numerous cases have been referred to, showing that a written contract cannot be contradicted, varied or explained, by parol, which is an inferior grade of evidence ; and that where an agreement is reduced to writing, all previous negotiations resting in *parol*, are extinguished by the written contract, and cannot be resorted to, to help out or explain its meaning. The first branch of the proposition is conceived to be true, as a general rule, but subject to various exceptions. The latter branch is admitted to be true, and to be without exceptions, other than those applicable to the first branch. To sustain this latter position, it is sufficient to refer alone to the case of *Parkhurst* v. *Van Courtlandt*,[a] cited for defendant. There the chancellor remarked, " I apprehend the rule to be too reasonable, and too well settled, to be now disturbed, that where an agreement is reduced to writing, all previous negotiations are resolved into the writing, as being the best evidence of the certainty of the agreement.— Every thing before resting in parol, becomes thereby extinguished or discharged."—See also, *Vandervoort* vs. *Col. Insurance Company*,[b] and *Mumford* vs. *McPherson*.[c] Another case mainly relied upon by the counsel for the defendant in error, is that of *Watkins* vs. *Stackett's adm'rs*.[d] That was a suit in chancery, seeking the right of redemption against a deed for lands and slaves, which was absolute on its face. The court of appeals of Maryland ruled, that parol evidence was inadmissible to vary or contradict the clear import of a written instrument, as well in equity as at law, *except where fraud is charged, or in cases of trust*. But that court, in the same case, held, *that fraud may be inferred from facts and circumstances, from the character of the contract, or from the condition and circumstances of the parties*. Also, that where fraud is charged, and the evidence establishes it, even in questions of title to land, the statute of frauds may very properly

[a] 1 Johns. Ch. R. 273.

[b] 2 Caines 155

[c] 1 Johns. R. 414; 8 Wheat. 211.

[d] 6 Harris & Johnson, 435.

be put out of the way, since the object of such evidence is not properly to contradict the instrument, but to raise an equity *dehors* the instrument, in contradiction of an intent to defraud, which no law or statute will be suffered to assist or protect; and so where mistakes are proved to exist, a court of equity will reform the contract; and that in such cases the power of the court to interfere seems indisputable.

The defendant's counsel have insisted with great zeal, and apparent earnestness, that relief cannot be had in a case like this, on proof, against the positive denial of the answer. This principle, so far as tenable, is more particularly applicable to allegations of *mistake*, in the absence of fraud or trust, and is so recognised in the case last referred to. It was there said, "The answer denies the existence of a mistake, and in such cases, there should be the strongest possible proof." Reference is there also made to a declaration of *Lord Thurlow*, "that the proof of a mistake should be established as much to the satisfaction of the court, as if it were admitted, and that the difficulty of doing this is so great, that there is no instance of its prevailing against a party insisting there is no mistake." This is believed to be the nearest approximation of authority to the principle contended for in this case, of any quoted in argument, and by it, I think the principle is carried too far: but, as has been shown, this doctrine applies exclusively to cases of alleged *mistake*, in contradistinction to *trust* and *fraud*. The reason for this distinction is obvious: an allegation of mistake imputes no dereliction of moral principle to the defendant—no distrust of his honor or integrity. A charge of fraud, or breach of trust, imputes all these, and seeks redress for injury thereby sustained, or threatened.

Many cases were cited by the complainant's counsel, showing, that the right of establishing by parol, that a conveyance, absolute on its face, was intended to operate as a mortgage, is an exception to the general rule, respecting the conclusive effect of written instructions; especially in cases of

*fraud* on the part of the defendant. I admit, however, that the parol evidence must be strong and satisfactory.

In *Washburn* vs. *Merrills*,[a] it had been agreed between the parties to a deed for land, that it should be executed as a mortgage, but by mistake and accident, it was executed as an absolute deed. A bill having been filed to redeem, the defendants pleaded the statute of frauds and perjuries, and that there was no note or memorandum of such agreement. The court held, that parol evidence was admissible, to show the mistake, and therefore decreed a redemption.

In *Ross* vs. *Norvell*,[b] the bill charged, that the conveyance, (being for slaves) though absolute in its form, was intended as a security, and that it was verbally agreed at the time, that the plaintiff might redeem at any time, upon payment of principal and interest. The answer in that case admitted the conveyance, but insisted that the *sale was absolute, and was intended as a satisfaction of a prior debt due to the defendant*. It does not appear in that case, that the bill contained any express charge of fraud, more than the allegation of the facts and circumstances, from which it was to be inferred. The court, however, on proof of the parol agreement for redemption, treated the case as one of trust and fraud, and, against the denial of the answer, decreed a redemption. The principle was at the same time recognised, on the authority of English cases, " that parol evidence, where there is a deed, is not to be admitted *in all cases*, nor refused *in all ;*" that " every case must depend on its circumstances."

In *Hatter* vs. *Etenaud*,[c] the right of redemption on an absolute bill of sale, on proof of a parol agreement at the same time, to that effect, was sustained. That suit was instituted by the vendee or mortgagee, to obtain a decree for the sale of the negroes, in payment of his debt, and the answer did not deny the intention of the contract, but alleged a failure of the consideration. The case shows, that in South Carolina also, a parol agreement that an absolute deed shall operate only as a security for a debt, will be enforced.

English
vs.
Lane.

[a] Day's Rep
139

[b] Wash. 14,

[c] Dess. 570.

English
vs
Lane.

a4 Johns. Ch. R. 167.

b2Atk 99, 258
3Atk. 389—1
Pow. on Mor.
104, 4th Lon.
edition.

c2Cowen 324

The case of *Marsee* vs. *Markee*,[a] appears conclusive on this point. There, the subject of controversy was real estate, and the bill sought a redemption of the premises. The defendant *set up an absolute sale, and denied the fact of the loan;* but at the same time admitted his subsequent consent to give time to return the money, and take back the conveyance. It was there shown, clearly, by parol proof, that a loan was intended, not a purchase and sale, and that for this purpose the conveyance was executed. The chancellor remarked, that on the strength of the authorities, and on the *proof of the loan, and of the fraud*, on the part of the defendant in attempting to convert a mortgage into an absolute sale, he should decree an existing right in the complainant to redeem. He maintained that various adjudications in the courts of England sustained the principle.[b]

The case of *Clark* vs. *Henry*,[c] is, in principle, the same. It was ruled in the court of errors, that a conveyance of personal property, absolute in terms, if intended by the parties to be a security for a debt, *is a mortgage;* and that this is the rule, whether the intention is manifested by a written defeasance executed simultaneously with the conveyance, or by the parol declarations, or the acts of the parties. It was in that case, also, declared, that there is no exception to the rule that a conveyance *which is once a mortgage is always a mortgage.*

Many other decisions, both English and American, might be quoted to the same effect, but these are considered sufficient to establish the principle conclusively, that in cases of trust, fraud, accident, or mistake, chancery is competent to afford relief. And that where there has been a breach of trust, or a fraud committed by setting up a conveyance as an absolute sale, in violation of a parol agreement, expressed and understood between the parties at the same time, that it should operate only as a mortgage, it will be sustained as a mortgage; and this, notwithstanding the answer positively deny the parol agreement, provided it be sufficiently proved,

and the mortgagor or vender has not participated in the fraudulent intent.a

2. Then does the evidence in this case sufficiently establish the parol agreement?

English
vs.
Lane.
7 Johns. Ch.
R. 40--1 Ver.
7.

The depositions of the witness Austill, may be regarded as the positive evidence of one witness to the existence of the parol agreement at, and subsequent to the execution of the deed; for though he was not present at the time, Lane and the witness were very intimate, and connected in other business. Lane had communicated to him the propositions of English, and his own intention to advance money on a pledge of the negroes, but to take the conveyance in the form of an absolute bill of sale for his better security—had informed him that three thousand dollars was the sum necessary to relieve English, but that he was to receive a nett premium of two thousand dollars for the advance, the whole to be paid from the hire and use of the slaves. They had calculated the transaction, and concluded that in three years or less the profits of the slaves would reimburse Lane the five thousand dollars, and that it would be a beneficial arrangement to him as well as to English. Lane expressed much friendship for English, and a strong desire to relieve him in any way safe to himself: such were the avowed intentions of Lane down to the time of his visit to English, when the bargain was consummated and the negroes delivered; and though the close intimacy between Lane and the witness, continued for some time afterwards, not a whisper or the slightest intimation was given of any modification of the contract. On the contrary, twelve or eighteen months afterwards, and after Lane had stopped the slaves from brick-making, and sent them on the farm, he spoke of them to witness as still being English's property, but said he intended to insist on the sale as absolute, unless English would immediately reimburse him for the advance he had made, and by which he said he had been injured. This I consider fully tantamount to an express

45

declaration, at the execution of the deed, that it was to be subject to redemption, especially when it is shown by other witnesses that the terms of the contract were not express at the time of executing the conveyance, but that a mysterious silence was observed by both the parties, as though Lane had required it under a belief or pretence that it was necessary for his security, and that English in his anxiety to be released, and confidence in Lane's friendship and honor, had acquiesced in the form and manner most acceptable to the latter.

The facts and circumstances detailed by other witnesses, appear totally irreconcilable with any other conclusion than that the right of redemption was intended, and ultimately agreed upon and understood between the parties. If not, why should English, after proposing to sell only part of his slaves to relieve himself, and when about one third in value would have been sufficient to pay his debts, have made so great a sacrifice in the sale of the whole. The witness, Singleton, who appears to have had the best opportunity of knowing the value of the slaves, thinks they were then worth in cash, eight thousand five hundred or nine thousand dollars. It is true, Darington also speaks of having been well acquainted with them, and estimates their value at only seven thousand dollars; but it is worthy of notice, that he appears not to have known the number; he says there were twenty five or thirty; without more certain knowledge, his testimony on this point, must yield to that which is more definite. The other proof that the negroes could have been hired at fourteen hundred to sixteen hundred dollars a year, corroborates Singleton's estimate of their value. It is shown by the testimony, and even admitted by the answer, that the sum necessary to relieve English did not exceed two thousand five hundred dollars, and that the aggregate of his debts was not more than three thousand dollars. Then, this latter sum at most, would have given English temporary relief, time, and liberty to effect, what appears to have been his anxious de-

sire, the preservation of the larger portion of his negroes: <span style="float:right">English vs. Lane.</span>
or if he chose to sell all as an absolute conveyance, perhaps
in this kind of property, more than any other, we may well
conclude he could at any time, in or out of jail, have received
something near their value.   I admit the principle, if he did
in fact sell at a greatly inadequate price, without fraud or
circumvention, but voluntarily, and in the exercise of a legal
capacity, that the inadequacy alone, does not avoid the sale.
But at the same time, I maintain that gross inadequacy may
imply fraud, and is a circumstance proper to be taken into
consideration, with other facts, to determine the intention of <span style="float:right">a1 Brown's C</span>
the parties, and the true character and object of a contract.a <span style="float:right">R. 149; 2 id.<br>150, 167; 2</span>
These circumstances are far from being all tending to show <span style="float:right">Burr. 1012;</span>
the existence of an agreement between the parties reserving <span style="float:right">1 Pr. Wms.<br>310; 4 Dess.</span>
the right of redemption.   The previous conversation held by <span style="float:right">697; Newl'd</span>
Lane with Singleton and English, in the jail, when the for- <span style="float:right">on Con. 365.</span>
mer reiterated the tale of his long acquaintance with, and
friendship for English, and consequent desire and intention to
relieve him by advancing the requisite sum of money, to be
repaid by the use of the slaves—his declarations at the same
time, that he intended to be made perfectly secure in the ad-
vance, but that English or any of his friends might at any
time redeem the slaves by refunding him the money ; and his
having in this way prevailed on Singleton to relinquish a
claim which he had on the slaves, as a farther inducement
for him, Lane, to risque the advance ; these facts strongly cor-
roborate the same presumption.   It is also worthy of special
notice, that all the witnesses who professed to know any
thing of the amount paid by Lane to, or for English, under-
stood the sum to be only three thousand dollars, or less.—
They derived their information from Lane a short time be-
fore the execution of the deed, and pending the negotiation.
Such was the understanding of Conway, the sheriff—of Sin-
gleton, who had an intimate knowledge of English's debts—
of Austill, with whom Lane held the most unreserved com-

English
vs.
Lane.

munication on the subject—and of Littell, from a conversation with English and Lane.

I admit that such conversations and negotiations may have been extinguished by, or merged in the written contract subsequently entered into, and that the courts are bound so to consider it, when such appears to have been the fact from the circumstances attending the consummation : yet, as in this case, nothing appears in connection with the actual contract to repel the conclusion, and especially as Lane insists that the consideration was different, and more than that expressed in the deed, I consider this kind of proof available as circumstantial or presumptive evidence that the sum was correctly expressed in the instrument—that the sum expressed in the deed as the consideration thereof, should be little, if any more than one third of the value of the property conveyed, and two thousand five hundred dollars less than the sum which the answer avers was agreed upon and actually paid for the property, is not one of the least surprising features in this extraordinary case. To these views, may be added the facts in evidence, by Cooper, that after the deed had been passed, he has an indistinct recollection of hearing Lane say to English, that if the latter would refund the money within a certain period he would restore the negroes. This is evidence from one of the defendant's witnesses, strongly tending to the same result. The expressions of gratitude by English, soon after signing the deed, for Lane's kindness, and of his preference for the arrangement made, over that proposed by another, to advance money on a pledge of the negroes, clearly indicate the same understanding. The record contains no evidence showing any disposition on the part of English, to defraud creditors, or any claimant of the property. Conway proves that immediately after the execution of the conveyance, he said he would pay his debts, if it took all his property. Singleton was the only claimant of the property, of whom we have heard, and he relinquished in favor of Lane, to aid in the arrangement, which Lane informed him was to

be a pledge, and which, if otherwise intended, was also a fraud on him.

This is deemed a sufficient review of the evidence, to determine the true character of the contract. Then, upon the principle contended for in argument, and maintained by the chancellor below, and which I fully recognise, that, in reference to facts responsive to the bill, the answer of the defendant must be taken as true, unless contradicted by two positive witnesses, or by one, and pregnant circumstances—how does this case stand? Austill is shown and conceded to be one positive witness, in disproof of the answer respecting the right of redemption. That all the other evidence detailed, furnishes pregnant circumstances, a concatenation of facts strongly corroborating the positive witness, we think entirely clear.

3. Then, the only remaining inquiry is, Are the allegations and prayer of the bill appropriate to the remedy sought?

Admitting that fraud in the conduct of the defendant was necessary to entitle the complainant to relief, it does not follow that it must be charged *eo nomine.* The allegation of the facts and circumstances from which the fraud is to be inferred, is conceived to be all that is necessary. This is sufficiently done in the bill before us. It also charges a trust and confidence, and a gross breach of that trust, and we think the evidence sustains the charge. If the defendant's intentions were locked up within his own breast, pending the negociation and at the time of its completion, his subsequent conduct may be regarded as a developement of what they originally were. The circumstances of the case imply fraud from the beginning, and if in fact the fraudulent intent was subsequently conceived, this can be known to himself alone, and he can claim no advantage from it.

It is also charged, that the hire or profit of the slaves, have more than reimbursed the defendant the money he advanced, and the complainant prays to have the negroes restored, and the bill of sale cancelled, and for other or further relief, as

English
vs.
Lane.

his case may authorise.    This is, in substance, a prayer for redemption.    The parol proof on this point establishes the fact, that a considerable sum has accrued to the defendant from the labor of the slaves, and that a much larger sum could probably have been raised by keeping them hired out, as at first contemplated, perhaps sufficient to have extinguished this lien upon them before the institution of this suit.    If, however, by hiring them at auction, or otherwise, the negroes would have been more exposed to hardship, injury, and ultimate loss, than by being used as they were, as one of the witnesses supposes, the complainant, (if the negroes be restored to him,) will derive a benefit from this source, and in consequence thereof, is entitled to a less rate of hire.

As has already been remarked, the amount which has been advanced by Lane on these slaves, is enveloped in mystery and doubt.    The answer and depositions do not enable us to decide this point as satisfactorily as could be wished ; and as the suit must be remanded, to effect other objects, we determine to leave this point open to such farther proof as either party may offer.

We are satisfied, on a full view of the case, that the decree rendered below must be reversed, and that a decree should be rendered, securing to the complainant the right to redeem all the slaves with their increase, on payment or discount of the amount of money advanced by the defendant, and interest thereon until paid.    That the bill of sale under which the defendant claims, be delivered up to the Circuit Court to be cancelled ; that the cause be remanded, that an account may be taken under the direction of the Circuit Court, of the amount of monies advanced by the defendant to the complainant, or in payment of his debts : also, an account of the profits, on an equitable estimate, from the hire or use of the slaves, from the time the defendant received them until the account may be taken.

Let a decree of this court be entered accordingly.